# UNITED STATES DISTRICT COURT

for the
Western District of Arkansas
Harrison Division

| | |
|---|---|
| In the Matter of the Search of<br><br>Information associated with<br>www.facebook.com/justin.baird.1694<br>this is stored at premises controlled by Facebook, Inc. | )<br>)<br>)<br>)<br>)<br>) |

Case No. 3:16 CM 13

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location)*: **Information associated with www.facebook.com/justin.baird.1694, this is stored at premises controlled by Facebook, Inc., more particularly described on Attachment "A".**

located in the Northern District of California, there is now concealed *(identify the person or describe the property to be seized)*:
**More particularly described on Attachment "B".**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- X     evidence of a crime;

- ___     contraband, fruits of crime, or other items illegally possessed;

- ___     property designed for use, intended for use, or used in committing a crime;

- ___     a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 16 U.S.C. §§ 470aa-470ll | Archaeological Resources Protection Act |
| 18 U.S. C. § 641 | Theft of Government Property |

The application is based on these facts:

X  Continued on the attached sheet.

☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Robert Lee Still, Special Agent, National Park Service
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   4/8/16

*Judge's signature*

City and state:   Fort Smith, Arkansas

Mark E. Ford, United States Magistrate Judge
*Printed name and title*

### IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF ARKANSAS

### AFFIDAVIT IN SUPPORT OF AN APPLICATION SEARCH WARRANT
### UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Robert Lee Still, being duly sworn, hereby depose and state as follows:

1.   I am a Special Agent ("SA") with the National Park Service ("NPS"), United States Department of the Interior. Presently I am assigned to the Washington Office, based in Harrison, Arkansas. I have been employed by the NPS as a Special Agent since 2007 and prior to that as a Federal law enforcement officer since 1998. I have received specialized training at the Federal Law Enforcement Training Center ("FLETC"), having completed the Land Management Police Training Program and the Criminal Investigator Training Program. I have attended and instructed advanced training courses in a variety of law enforcement subjects, and have conducted criminal investigations into a variety of offenses.

2.   As a National Park Service Special Agent, I investigate violations of Titles 16, 18, and 21 of the United States Code including criminal violations relating to 16 U.S.C. § 470aa-470ll, (Archeological Resources Protection Act ("ARPA") and 18 U.S.C. § 641 (Theft of Government Property,) including Title 36, Code of Federal Regulations ("36 C.F.R."), 2.1 (Preservation of natural, cultural, and archeological resources.)

3.   I have received specialized training regarding violations of the ARPA through the FLETC. During my law enforcement career I have participated in numerous investigations involving the illegal taking of artifacts from

1

public lands and the theft/vandalism of government property. As a result of my training and experiences, I have become familiar with the many techniques employed by individuals and organizations that endeavor to further this type of criminal activity.

4.      I am an Adjunct Instructor for the FLETC and since 2007 and have provided advanced Archeological Resource Protection Training to federal, state and local law enforcement officers, and government archeologists. This intensive course of instruction taught by a criminal investigator, archeologist, and an Assistant United States Attorney ("AUSA"), includes classroom training in the applicable statutes and elements, crime scene processing, writing of search warrant applications, and testifying in court, and concludes with a day-and-a-half practical field exercise in which students interact with role-players to investigate a suspected ARPA violation, process the crime scene, write a report, including an archeological damage assessment, present that report to an AUSA, and testify in court.

5.      I make this affidavit in support of an application for a search warrant for evidence and records of violations of 16 U.S.C. §§ 470aa-470ll (the Archeological Resources Protection Act), 18 U.S.C. § 641 (Theft of Government Property), and 36 C.F.R., 2.1 (Preservation of natural, cultural, and archeological resources,) which are currently located in stored communications and other files reflecting communications **to or from user account/user name: www.facebook.com/justin.baird.1694, on the systems, hard drives, and other permanent, removable, or storage drives and servers for Facebook,**

2

**Incorporated**, and respectfully request authority to search the locations described in "Attachment A" and examine the seized items, specified in "Attachment B", as evidence and records of these crimes.

6.     The statements in this affidavit are based on my personal observations, my training and experience, my investigation of this matter, and information obtained from other agents, investigators, and witnesses.  Because this affidavit is submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

## STATUATORY AUTHORITY

7.     Title 16 United States Code, Sections 470aa-470ll (Archaeological Resources Protection Act), states in relevant part:

> 16 U.S.C. § 470bb "Definitions- (1) The term "archaeological resource" means any material remains of past human life or activities which are of archaeological interest, as determined under uniform regulations promulgated pursuant to this chapter. Such regulations containing such determi-nation shall include, but not be limited to: pottery, basketry, bottles, weapons, weapon projectiles, tools, structures or portions of structures, pit houses, rock paintings, rock carvings, intaglios, graves, human skeletal materials, or any portion or piece of any of the foregoing items. Non fossilized and fossilized paleontological specimens, or any portion or piece thereof, shall not be considered archaeological resources, under the regulations under this paragraph, unless found in archaeological context. No item shall be treated as an archaeological resource under regulations under this paragraph unless such item is at least 100 years of age."

> 16 U.S.C. § 470cc "(a) Application for permit -
> Any person may apply to the Federal land manager for a permit to excavate or remove any archaeological resource located on public lands or Indian lands and to carry out activities associated with such excavation or removal. The application shall be required, under uniform regulations under this chapter, to contain such information as the Federal land manager deems necessary, including information concerning the time, scope, and location and specific purpose of the proposed work.

3

(b)  Determinations by Federal land manager prerequisite to issuance of permit A permit may be issued pursuant to an application under subsection

(a) of this section if the Federal land manager determines, pursuant to uniform regulations under this chapter, that—

(1)  the applicant is qualified, to carry out the permitted activity,
(2)  the activity is undertaken for the purpose of furthering archaeological knowledge in the public interest,
(3)  the archaeological resources which are excavated or removed from public lands will remain the property of the United States, and such resources and copies of associated archaeological records and data will be preserved by a suitable university, museum, or other scientific or educational institution, and
(4)  the activity pursuant to such permit is not inconsistent with any management plan applicable to the public lands concerned."

16 U.S.C. § 470ee (a), "Unauthorized excavation, removal, damage, alteration, or defacement of archaeological resources-

No person may excavate, remove, damage, or otherwise alter or deface, or attempt to excavate, remove, damage, or otherwise alter or deface any archaeological resource located on public lands or Indian lands unless such activity is pursuant to a permit issued under section 470cc of this title, a permit referred to in section 470cc (h)(2) of this title, or the exemption contained in section 470cc(g)(1) of this title".

16 U.S.C. § 470ee (b) "Trafficking in archaeological resources the excavation or removal of which was wrongful under Federal law-

No person may sell, purchase, exchange, transport, receive, or offer to sell, purchase, or exchange any archaeological resource if such resource was excavated or removed from public lands or Indian lands in violation of-

(1)  the prohibition contained in subsection (a) of this section, or
(2)  any provision, rule, regulation, ordinance, or permit in effect under any other provision of Federal law".

16 U.S.C § 470ee (c) "Trafficking in interstate or foreign commerce in archaeological resources the excavation, removal, sale, purchase, exchange, transportation or receipt of which was wrongful under State or local law

No person may sell, purchase, exchange, transport, receive, or offer to sell,

4

purchase, or exchange, in interstate or foreign commerce, any
archaeological resource excavated, removed, sold, purchased, exchanged,
transported, or received in violation of any provision, rule, regulation,
ordinance, or permit in effect under State or local law".

8.    Title 18 United States Code 641 (Theft of Government Property), states in

relevant part:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or
> the use of another, or without authority, sells, conveys or disposes of any
> record, voucher, money, or thing of value of the United States or of any
> department or agency thereof, or any property made or being made under
> contract for the United States or any department or agency thereof; or
>
> Whoever receives, conceals, or retains the same with intent to convert it to
> his use or gain, knowing it to have been embezzled, stolen, purloined or
> converted-
>
> Shall be fined under this title or imprisoned not more than ten years, or
> both; but if the value of such property in the aggregate, combining
> amounts from all the counts for which the defendant is convicted in a
> single case, does not exceed the sum of $1,000, he shall be fined under
> this title or imprisoned not more than one year, or both.

9.    Title 36, C.F.R., 2.1, Preservation of natural, cultural, and archeological

resources, states in relevant part:

> (a) Except as otherwise provided in this chapter, the following is
> prohibited:
>
>    (1) Possessing, destroying, injuring, defacing, removing, digging, or
>    disturbing from its natural state:
>
>       (iv) A mineral resource or cave formation or the parts thereof.
>
>       (6) Possessing, destroying, injuring, defacing, removing, digging,
>       or disturbing a structure or its furnishing or fixtures, or other
>       cultural or archeological resources.

5

## PROBABLE CAUSE

10.     Probable cause exists that **Nathan Bradford LEMAY of Alpena, Arkansas,** using a 2001 silver Acura, Arkansas Vehicle License 698 UNW, VIN# 19UYA42451A006929, and **Justin Charles BAIRD of Hot Springs, Arkansas,** using a 2014 silver Kia, Arkansas Vehicle License 228 TPL, VIN#KNAFK4A65E5183160, accessed public lands held in fee simple ownership by the United States, namely the Buffalo National River in Marion County, Arkansas, and excavated, removed, transported, damaged, altered, defaced, or destroyed mineral or archeological resources and/or other government property.

11.     Further, both persons are involved in the purchase, exchange, transport, receipt, or are offering to sell, purchase, exchange, or transport of geological or mineral resources excavated or removed from public lands, and in doing so damaged, altered, defaced or destroyed an archeological resource on public or Indian lands. As is set forth below, **probable cause exists that evidence, fruits, and instruments of these crimes involving violations of 36 C.F.R., 2.1 (Preservation of natural, cultural, and archeological resources), 16 U.S.C. § 470aa-470ll (the Archeological Resources Protection Act) and 18 U.S.C. § 641 (Theft of Government Property) are currently located in stored communications and other files reflecting communications to or from user account/user name: www.facebook.com/justin.baird.1694.**

12.     On or about February 18, 2016, I conducted a layman's examination of the public areas of "Facebook.com" and located three Facebook Pages directly

6

related to both subjects: **www.facebook.com/nate.lemay.58**,

**www.facebook.com/AlpenaCrystals** [LEMAY], and

**www.facebook.com/justin.baird.1694**. It appeared during this search all three accounts, attributed to LEMAY and/or BAIRD, have been used as an instrumentality in the course of, and in furtherance of, the crimes described above. Moreover, it is reasonable to believe that these accounts contain records and evidence, stored in electronic form, and currently exist on the systems, hard drives, and other permanent, removable, or storage drives and servers for Facebook Incorporated.

### Facts of the Case

13.    On Friday, October 10, 2014, at approximately 1550 hours, NPS Dispatch ("MROCC") received a call concerning the theft of cultural and natural resources at Rush, within Buffalo National River's Lower District. The caller/complainant, INFORMANT #1, stated he knew a white male, he identified as Nathan LEMAY, was stealing minerals and possibly artifacts from Rush and the "Philadelphia Mine," and trafficking them through a store front, Alpena Crystals, 116 East Main Street, Alpena, Arkansas.

14.    On Friday, October 10, 2014, at approximately 1835 hours, I contacted INFORMANT #1, by phone and conducted an interview at his request. A female, whom he later identified as, INFORMANT #2, answered the call originally and placed me on speaker phone so both could talk to me.

15.    During this phone conversation, INFORMANT #1 began by talking about a male subject, he identified as Nathan LEMAY, who he stated owned a rock shop in

Alpena, Arkansas. He described the business as being on the main road in town and gave the following description as "Alpena Crystals, 116 Main Street, in Alpena." INFORMANT #1 and INFORMANT #2 described how they are aware of LEMAY's business, and they have known about LEMAY and his business "about two months."

16.     INFORMANT #2 described how LEMAY recently offered to sell her "rocks" in the form of quartz minerals he had taken from Rush at Buffalo National River. She admitted she makes jewelry out of native stones, quartz, and other materials. I asked her to tell me what he looked like, and she described LEMAY as "in his mid-20's, blonde, 5'7, slim build, with a goatee." INFORMANT #1 stated LEMAY had recently gotten caught "on the Buffalo River, by a ranger, and got a ticket for no fishing license."

17.     INFORMANT #1 stated he was very upset that LEMAY was trying to sell them minerals and materials he knew to be stolen out of the Rush area of the park. He repeatedly stated LEMAY was working out of the mines at Rush and another area he identified as the "Philadelphia Mine." LEMAY admitted to INFORMANT #1 he was mining and removing quartz mineral materials out of a "dead mine on federal lands at Hot Springs." I asked him if that was located on Hot Springs National Park and he agreed that it was.

18.     I asked INFORMANT #1 to describe what types of minerals he was removing from NPS lands, and he specifically identified the following: "Jersey [Drusey] Crystals, Quartz, priced at $300-400 a stone, "Smith[s]onite," priced at $20-70 a stone, depending on size, and "Pink Dolomite," priced at $20-70 a stone

8

19.     INFORMANT #1 stated LEMAY was selling just the raw materials out of his

        shop in town. He described how LEMAY used "lock picks," which he carries in

        the zipper compartment of a brown and yellow backpack into the park. He uses

        the picks to gain access or get around barred access gates at the entrances to the

        mines, which INFORMANT #1 understands are placed there to protect bat

        colonies and as a safety barrier to the mines.

20.     I asked INFORMANT #1 how he knows where LEMAY digs in the park. He

        stated LEMAY's ex-girlfriend, "Jessie [LNU]," personally showed him one of

        the pits LEMAY uses. INFORMANT #1 claimed that about a month prior, she

        went with LEMAY to take materials, and someone "shot at them" and she quit

        associating with him after that time. I asked when the last time LEMAY was in

        the park [Buffalo National River] and he replied his "last visit was in mid-

        August [2014]." INFORMANT #1 stated LEMAY told him this while trying to

        sell he and INFORMANT #2 minerals "from Rush" out of the back of his store

        in Alpena [Arkansas].

21.     INFORMANT #2 explained how LEMAY had recently sold some of the

        minerals to a store in Eureka Springs, Arkansas for "about $1,500.00." She

        explained how she was a "jewelry artist" and uses rock material routinely. She

        alleged "90%" of LEMAY's sales out of his store were stolen

        minerals/resources. She continued that LEMAY focuses on removing large

        amounts of mineral resources from the park at Rush and from Hot Springs. She

        stated that recently, LEMAY bragged to them he recently removed 500 pounds

        of raw mineral material, "one hundred pounds at a time." LEMAY continued

9

that he was getting into the area about "once a month and getting up to 1,000 pounds per trip." She stated he recently tried to sell her "a 10 pound flat for about $100.00." She stated it was still dirt covered and he talked about it coming from Rush. She refused to buy the material which she said was still sitting on an open sales area of his store. According to INFORMANT #2, LEMAY has an area in the back of his store which he brings the raw material into and then cleans the minerals prior to selling them.

22. I asked INFORMANT #1 if LEMAY took anything else other than mineral resources from federal lands. He answered "yes-openly on the Buffalo" he takes arrowheads, and from areas immediately around Alpena. He stated he recently sold a "Rush Dalton for about $1,200."

23. I asked INFORMANT #1 how LEMAY operates when he goes to the park. He replied he is usually alone and uses his backpack, a simple hammer, and screwdriver, which he carries in the pack described above with other tools. He described a "sinkhole at Rush" where he commonly goes and his girlfriend "Jessie" described it to him once as "where we come to get all our quartz." I asked what vehicles LEMAY used and he stated he has "grey or blue, 1988 Jeep Grand Cherokee" and a "mid-90s, red Chevy Suburban" that he commonly uses with a trailer.

24. Based on my training and experience, I know that persons engaged in this type of illegal digging activity, for geological, mineral or archeological resources, often use similar tools to search for, locate, evaluate, dig and remove the resources and then excavate them using those tools or other types of digging tools. I also know

10

that collectors often photograph the minerals or artifacts they find and their
locations with cellphones and cameras. Often, collectors take photographs of the
items at the time they are located. By doing this, artifact collectors increase the
value of their find, by establishing the provenience of the mineral or artifact
being removed. Photography also affords artifact collectors the opportunity to
share the act or artifact with other persons, including transmitting the images via
email, text message, or by other electronic means using electronic or computer
based devices.

25.    As a follow up to INFORMANT #1's statements in reference to "fishing
violations," I attempted to locate any law enforcement contacts LEMAY had
with officers regarding such contacts as described by INFORMANT #1. No such
contacts were discovered within the NPS; however, Arkansas Game and Fish
Commission ("AFGC") Officer Kelly Sanders contacted LEMAY on 10/3/2014
in Carroll County Arkansas for such a violation.

26.    On Thursday, October 16, 2014, at approximately 0910 hours, I spoke with
AGFC Officer Sanders in reference to this investigation. Sanders stated she
contacted a white male, identifying himself as Nathan LEMAY, for a fishing
violation on 10/3/2014 at approximately 1820 hours near a concrete slab along
Osage Creek, off Carroll County Road 995, south of US Highway 412 near the
community of Osage. When she approached the vehicle, LEMAY moved
suddenly away from his pole and walked away. A late model, possibly a 2005,
white or silver, four door passenger car, unknown vehicle license, was parked on
the slab with the trunk and passenger door open. She did not record the license

11

plate number of the vehicle.

27.     LEMAY was accompanied by a white female, described as being in her mid-20's, with curly blonde or brown hair. She was accompanied by a juvenile male, about 5-8 years of age, at or near the car. Sanders did not identify either of other two persons and it surprised her to find someone fishing at this location.

28.     During the contact, LEMAY told Sanders he was a "self-employed miner" and moved a lot between Florida and Arkansas. He told her he "dug quartz in Arkansas and around Mt. Ida, Arkansas." When Sanders asked about the female, LEMAY told her she was "just a friend of mine" and he didn't have a place to live in particular, but was staying with some friends and described how the female subject lived just outside of Osage. Sanders issued LEMAY a citation notice for fishing without a license.

29.     From November 2014 into and through 2015, I continued to monitor the business, at variable times and dates, from outside the business, looking for persons or vehicles matching those listed above. During the winter months of 2014-2015, the business appeared closed, but appeared to open during the Spring and Summer months. No contacts were reported by the NPS at Buffalo National River or Hot Springs National Park with LEMAY or anyone matching his description.

30.     During this period of time, I provided information to law enforcement officers assigned to the Buffalo National River about LEMAY, and contacted officers at Hot Springs National Park in reference to the investigation asking them to provide me with information on any persons contacted for similar activities. A

12

few contacts were made along the Lower Buffalo, but nothing that appeared connected to this investigation.

31. On Sunday, On February 14, 2016 at approximately 0912 hours, USPR David Sullivan was on patrol at Rush Campground located within Buffalo National River. While driving into the campground, he recognized a vehicle in the parking lot, a 2001 silver Acura, Arkansas Vehicle License 698 UNW. He had previously had interactions with the owner of the vehicle, later identified as Nathan LEMAY, while he was camping in the area during the weekend of February 6, 2016.

32. As Officer Sullivan approached the campsite, he saw Nathan LEMAY (identified by his Arkansas Driver's license) leave one of two tents. He parked, left his patrol vehicle and made contact with him. As the two spoke near LEMAY's vehicle, Officer Sullivan could see in plain view a large clear plastic bin in the front passenger seat of a neighboring car, a 2014 Silver Kia Arkansas Vehicle License 228 TPL. Inside the bin, he saw numerous rocks and other mineral resources.

33. Sullivan asked LEMAY who the car belonged to and he stated his friend (later identified by his Arkansas Driver's License as Justin BAIRD) who was still sleeping in the tent next to his. When LEMAY was asked about the rocks in the car next to his, he stated BAIRD and he were collecting them from the park, but did not give a specific location. LEMAY told Officer Sullivan earlier that morning he couldn't sleep and decided to collect rocks along the river bank [Buffalo River].

13

34. Before exiting his patrol vehicle, Officer Sullivan ran the vehicle license tags on the two cars. MROCC informed him they did not have any insurance information for LEMAY's vehicle. When Sullivan asked LEMAY if he had current insurance on his vehicle, he stated yes and proceeded to get into the driver's side of his car. While looking for his insurance, LEMAY pointed out he had more rocks under the driver's seat of his car. During this time, Sullivan was standing next to the driver's side of the vehicle and could smell the odor of marijuana emitting from the interior of the vehicle. LEMAY exited and stated he could not find current insurance information but had it on his [cell] phone.

35. During the contact BAIRD exited his tent, and as he approached, Sullivan sat both down on the parking lot wooden guard rail. Sullivan explained to LEMAY and BAIRD that collecting resources from the park was not allowed. He told LEMAY and BAIRD that he was going to search their vehicles and LEMAY's person due to knowing there were park resources in the vehicles and on his person. Sullivan searched LEMAY's person finding small rocks and dirt in his right front pocket. He asked BAIRD if his vehicle was unlocked and he replied it was not. He asked BAIRD if he could unlock his vehicle for him to which he responded by handing him the ignition key. During this time, LEMAY's demeanor changed from cooperative to confrontational and he began recording Sullivan with his cell phone.

36. During the search, Officer Sullivan found BAIRD's vehicle contained a large clear plastic container with numerous minerals hand wrapped in paper on the passenger's seat. On top of the container was a green military style back pack

14

with mineral resources and hand tools inside. In the center console, Sullivan found a metal grinder with a green leafy substance, appearing to be marijuana, a clear plastic sandwich bag containing multiple pills (BAIRD stated was all multi-vitamins), numerous cigarettes, which were half emptied of tobacco, rolling papers, and lighters.

37. On the driver's side door arm rest, Sullivan located four small mineral resources that BAIRD was adamant he not take. Sullivan seized them and placed them into an evidence bag. In the trunk of the vehicle, He found multiple hand tools, a hard hat with a headlamp on it; clothes with fresh dirt on them, and a large green plastic storage container filled with paper wrapped mineral resources and estimated the container weighed approximately 70 pounds.

38. Inside LEMAY's car, Officer Sullivan found rolling papers in the center console and the rocks LEMAY had referred to earlier under the front driver's seat. In the trunk, he found another large green storage container full of paper wrapped mineral resources, various hand tools used for digging, a hard hat with a headlamp, rubber boots and clothing with fresh dirt on them.

39. During the search of the vehicles, Sullivan heard whispering between LEMAY and BAIRD. When he looked up, LEMAY stated that he did not collect the mineral resources from the park, but from what he described to Sullivan was the "Philadelphia Mine." This mine is located on private lands across from Clabber Creek adjacent to the park. Both were cited for Possession of Mineral Offenses under 36CFR 2.1(a)(1)(iv), and BAIRD was cited for Possession of Drug Paraphernalia, assimilating Arkansas State Code 5-64-443 (a) (1) pending further

15

investigation.

40.     Officer Sullivan conducted an inventory of the items seized from LEMAY and
        BAIRD identifying several items for the purposes of safekeeping. Fearing he
        might damage the items wrapped in paper for transport, Sullivan did not remove
        and examine every wrapped and stored item in the containers and later decided
        to obtain a search warrant for the containers for further examination. Due to the
        volume, several tools and articles of clothing were not seized from LEMAY and
        BAIRD's vehicle and were subsequently left inside their vehicles.

41.     On Tuesday, February 16, 2016, I received a carbon copy email from NPS
        Archeologist Caven Clark from Officer Sullivan to Park Geologist Charles
        Bitting. Sullivan explained that he had contacted LEMAY and BAIRD and
        requested assistance with identification of the minerals unaware LEMAY was
        the focus of an ongoing criminal investigation.

42.     On Wednesday, February 17, 2016, I reviewed the dispatch contact log
        information regarding Sullivan's contact of 2/14/2016. During this time, I
        learned that LEMAY and BAIRD were contacted for the offenses described
        above. BAIRD was previously unknown to me, but had a Hot Springs Arkansas
        address suggesting a possible connection to that area and Hot Springs National
        Park.

43.     I contacted Officer Sullivan about his interaction with LEMAY and BAIRD and
        directed him to examine the mine areas around the Rush Historic District to look
        for possible evidence of digging within the various mines and sinkholes in the
        area in connection to my ongoing investigation of 2014-2015.

16

44.    During the afternoon of 2/17/2016, Officer Sullivan and USPR Dale Johannsen
       went to the "Philadelphia Mine," on private lands, to see if there had been any
       recent activity consistent with the taking of a large quantity of crated or bagged
       minerals or other material from the mine. Neither officer located any signs of
       recent activity at that location.

45.    Both then went to the Monte Cristo Mine located inside the boundaries of
       Buffalo National River. The Monte Cristo Mine had been shut down and sealed
       with welded grates from entry for the safety of visitors and the protection of its
       mineral and archeological resources, as well as endangered bat species. The mine
       had a chain link fence blocking access to the mine entrances, in addition to large
       steel grates bolted into the mines walls to prevent entry.

46.    Officer Sullivan reported that one particular mine entrance had a section of the
       grate cut out by vandals. Looking inside, the officers saw what appeared to be a
       bag. Ranger Johannsen entered the mine through the opening finding the item to
       actually be a large wad of white packing type paper which was consistent with
       that used to wrap the mineral resources LEMAY and BAIRD had in their
       possession on 2/14/2016.

47.    Also in the mine with the paper, was discarded packaging material from a
       possible new head lamp, AAA Energizer batteries, and a Keystone Light 16oz
       beer can with a few ounces of beer left in the can which were collected as
       evidence. The vandalized mine grate was repaired on 2/18/2016 to prevent
       access to the mine and preserve any additional evidence it might contain.

48.    After returning from Rush, Sullivan requested assistance with processing the

17

evidence collected at the Monte Cristo Mine. I travelled to the Buffalo Point
Ranger Office to assist him with processing the can for latent and DNA evidence
that it might contain. All items were entered into evidence.

49.    On Thursday, February 18, 2016, I accessed the public areas of
**www.facebook.com** looking for information and pages associated with
LEMAY, BAIRD, or a brick and mortar store front named "Alpena Crystals" in
Alpena, Arkansas. I was able to locate three Facebook Pages matching their
descriptions respectively as follows: **www.facebook.com/nate.lemay.58**,
**www.facebook.com/justin.baird.1694,** and
**www.facebook.com/AlpenaCrystals [LEMAY]**.

50.    LEMAY and BAIRD appeared linked together as "Friends" on the website, and
LEMAY appeared to be tied directly to "Alpena Crystals" Business Facebook
Site as the proprietor or owner of the brick and mortar business located
physically in Alpena, Arkansas with the same name and a photograph of the
business on the Facebook page. On his personal page, LEMAY also listed
himself as "Rock Star at Alpena Crystals" in the "Intro" [Biographical Section]
of his page.

51.    During the examination of **www.facebook.com/nate.lemay.58**, I located a
posting entitled "Nathan LeMay, February 14 [2016] at 11:48am". This posting
appeared to have been posted by mobile phone just after Officer Sullivan's
contact with LEMAY at Rush Campground. It contained the following text,
"Well this just happened. Lol I had permission on private property, but was
camping on federal land and couldn't prove they were from elsewhere." The

posting contained a cropped photograph of what appeared to be the violation notice LEMAY was issued for possession of mineral resources by Officer Sullivan.

52.     Several comments followed including one by LEMAY stating "They closed all our caves in false pretenses too. Dunno if u [sic] knew that. The claim that the bats are getting sick, however in Arkansas there have been zero reported cases. Also now that we know how it spread human contact and mines does not even affect the bats. But our Caves are still closed nationwide". Further he posted, "Sorry for typos, voice texting while driving". BAIRD, using his Facebook access through **www.facebook.com/justin.baird.1694,** responded to his post "Yeah fuck that ranger". One commented "stop raping our national resources" to which LEMAY posted "Collecting a rock for someone to cherish and stripping whole mountains for coal or whatever are so different. What I do is no worse than what would happen in a bad rain". When someone suggested showing pictures to defend his claim, he replied "I have pictures".

53.     I know through experience and training that the mines in the Historic Rush Mining District, including the Monte Cristo Mine, have been gated for public safety, protection of the mine and its natural and archeological resources, and protection of endangered bat species which use the mine as a hibernaculum during the winter months for protection. Furthermore, that the "Philadelphia Mine," which is located on private property, is owned by a private landowner in Yellville, Arkansas. This landowner prohibits the use of her property by anyone without written permission, excepting NPS officers in the course of their duties,

19

and has had numerous issues with trespassing in the past.

54.     I examined "Facebook" in the public areas of the Facebook Site,

**www.facebook.com/AlpenaCrystals**, showed a map and address of the store's

location listed at "116 E Main St, Alpena, Arkansas" and listed a business phone

number of "(479) 340-7764" which is the number LEMAY gave to Officer

Sullivan on 2/14/2016 as his contact number. LEMAY also appeared as a

Facebook user from his personal Facebook page "Nathan LeMay" "checked in"

at "Alpena Crystals, Alpena, AR" with a pop up screen showing the brick and

mortar store's Facebook link and photograph of the store front. This was

complete with a photo depicting stones and crystals, a toddler, and a symbol

denoting a map marker used to pinpoint the cell phone users location on a map

[Nathan Lemay at (symbol) Alpena Crystals].

55.     LEMAY's personal Facebook page appeared linked to Facebook page

**www.facebook.com/groups/507222459442829 [Rocks for Cheap]**. The

"Rocks for Cheap" Group appeared to offer a site designed for the trading,

buying and selling of geologic, mineral, and other stone material. LEMAY

posted ten raw material geological or mineral items for sale from "Alpena,

Arkansas" ranging in price from"$7-95" per individual item with shipping

included in the United States. The site also depicted finished/processed

geological specimens or minerals, art and jewelry items.

56.     Eighteen Facebook Group Sites were observed on LEMAY's Facebook Group

page, in relevant part: "Lapidary," "Real Rockhounding Trunk Show Artisans,"

"Opal Fever," "All about the rock 24 hours shows!," "Gems, Stones, and Stuff,"

"New Mexico Rockhounds," Carolina Truck and Gift Shows," "Let's Rock!
Auctions and BIN," "The Lapidary Alliance," "Mystic Earth Gems," "Rocks for
Cheap," "We Have Rocks in our Head," "Unlimited Slabs and Cabs," "The
Rockhound Connection," "Rock Shop Auctions," "Arkansas Rockhounds,"
"Rockhound Market," and "The Miner's Market." Several others were listed
offering similar materials or objects as the point of interest of the Group.

57.    I also conducted a layman's examination of "Facebook" in the public areas of
**www.facebook.com/justin.baird.1694** related to BAIRD. BAIRD's most recent
posting showed a photograph of a geological specimen of unknown origin or
location on "January 25 [2015] at 10:19pm". BAIRD's Facebook pages showed
multiple photographs, a video, and other postings related to geological or mineral
specimens appearing to be in his possession; and posts related to searching for,
locating, and excavating the same. BAIRD listed in his "Intro" section that he
"Lives in Hot Springs, Arkansas."

58.    BAIRD's personal Facebook page also listed his membership in Sixty-seven
Group pages, including in relevant part: "People who love rock hounding,"
"Carolina Rockhounds," "Rockhound market place," RockHound Dog Pound
!!," Handmade Jewelry Makers," All Gemstones & USA wraps are selling and
buying this group," Crystal Healing and Positive Vibrations," Real
Rockhounding Strictly Sales," "Real Rockhounding Trunk Show Artisans,"
"*The Rock Shop*," "RockHounds," "Crystals Rocks & Gems Group," "Jason's
Box of Rocks," "Rocks for Cheap," "THE ROCK HUNTER," "Arkansas
Rockhounds," "Lapidary Equipment Marketplace," "Lapidary," "Rocks Gems

and Minerals," "The Fossil Forum," "Mineral Specimen Identification Room,"
"Fine Mineral Specimens for Sale," "Minerals you are trying to sell or swap,"
and others listed offering similar materials or objects as the point of interest of
the Group. LEMAY also appeared as a Facebook user "Nathan LeMay" listed in
BAIRD's "Friends" Group section of his personal Facebook page.

59.     One posting observed during this examination listed LEMAY with BAIRD
        stating "Nathan LeMay added 5 new photos — with Justin Baird at Alpena
        Crystals, June 23, 2015, Alpena, AR, United States" showing multiple boxes of
        geological specimens and the text "Finds from this weekend in mt ida! 27 flats of
        quality pieces. I even hit a phantom pocket! Lots of cleaning in my future…"

60.     Based on this information, pursuant to Title 18, United States Code, Section
        2703(f), I sent a Preservation Order to Facebook at
        **www.facebook.com/records**, requesting preservation of records belonging to;
        Nathan LEMAY, "**www.facebook.com/nate.lemay.58**," Alpena Crystals,
        "**www.facebook.com/AlpenaCrystals/**," and Justin BAIRD,
        "**www.facebook.com/justin.baird.1694**." This order request was received by
        Facebook Incorporated as Case #728158.

61.     On Friday, February 19, 2016, at approximately 1250 hours, I received a
        telephone call on my office phone from a male caller, identified on Caller ID as
        "4793407764," who identified himself as Nathan LEMAY. LEMAY's call was
        prompted by a telephone call from NPS Ranger David Sullivan to BAIRD who
        called him in reference to voiding the citation notice he received on 2/14/2016 at
        Rush Campground for possession of mineral of resources [36 CFR 2.1, et al].

22

Officer Sullivan never gave LEMAY my telephone number, but did give it to

BAIRD, indicating that the two were continuing to talk with each other about the

contact in the park.

62.    During the conversation, LEMAY stated he wanted more information as to how

to get his property back and that it had been illegally taken by Officer Sullivan,

without cause, and that the officer "stole" his property. I told LEMAY the matter

had been referred to me because it needed further investigation and he was

welcome to come talk to me about it. I told LEMAY he could return the

violation notice and it would be voided, but that did not mean he couldn't

eventually be charged in the matter depending on the outcome of an ongoing

investigation beyond possession of the geological or rock material.

63.    LEMAY offered to bring his citation to me, explain his story, and show me

photographs of the areas he recovered all of the items. He also claimed he had

permission to dig those items on private property and could show me through

videos and other materials where he recovered the items. LEMAY continued to

deny any wrong doing, but described that the property taken from him was worth

"$8-10,000" and he did not want it damaged. Furthermore, he stated that the

"stuff wasn't that big a deal" as "I deal in millions of dollars' worth of rocks,"

but insisted on getting his stuff back. LEMAY mentioned again he had

permission to dig for the items, which came "from all over the place," and he

could show me videos and pictures on his cell phone of where it came from. I

asked him if he would be willing to let me examine his cell phone and he

emphatically denied me permission to look at his cell phone.

23

64.     He continued that he was going to consider talking to a lawyer before doing
        anything and that he would get back to me "next week on Monday or Tuesday"
        as he was going out of town to do more digging this weekend citing the weather.
        I asked him where he was going and he stated "down [in] south Arkansas" at
        Magnet Cove. I am familiar with this location as an area near Malvern, Arkansas
        southeast of Hot Springs. He described how "there was good stuff there and if
        you get to know the right people they will steer you in the right direction" before
        dropping the conversation abruptly.

65.     On Tuesday, March 1, 2016, Dr. Caven Clark, NPS Archeologist provided me
        cultural background information on the Rush Historic District including the
        Monte Cristo Mine. The Rush Historic District ("RHD") was nominated to the
        National Register of Historic Places in February 1987. The RHD is a 1,316 acre
        area along the Buffalo River containing the structures and mines as a zinc mining
        community from 1880 to 1940. Standing buildings, ruins, and other documented
        site areas, as well as the mines themselves, and the road system identify this area.
        The sites include those that have retained their historic mining community use
        and those that have been altered by the post-mining recreational use of the area.
        The district is divided by topography into three sections: the Rush Creek valley;
        the Clabber Creek valley; and the contiguous Buffalo River terraces and bluffs.

66.     The Monte Cristo Mine is documented Contributing Property #79 for the RHD.
        It was active in 1900; 1915-1917; 1920s; and 1961-1962. It is a two-level mine
        containing track, ore cars, boilers, hoists; and other machinery near the entrance.
        The Mine had aerial tram across Clabber Creek to the Philadelphia Mill [Mine].

24

It has been utilized in scientific studies for the historical, cultural and archeological components it contains, as well as the mineral remains which have been studied for identifying the relationships between bedded and breccia types of mineralization. It is on the List of Classified Structures containing the Mine, #107955, and #107957, composed of an Air Compressor and shed. The site is located within a tract owned in fee simple by the United States Department of the Interior and managed by the National Park Service and is part of Tract 40-106 owned in fee simple interest and managed by the NPS.

67.   ARPA permits are issued by the NPS Regional Director, Midwest Region, National Park Service, Omaha, Nebraska through the Regional Archeologist, Midwest Archeological Center (MWAC), National Park Service, Lincoln, Nebraska. After checking permit files with the MWAC, Dr. Clark determined any excavation or removal activity at the Historic Rush Mining District, Monte Cristo Mine, or other sites it contains, was undertaken without a permit.

68.   Also on March 1, 2016, Officer Sullivan applied for and received a search warrant for the containers seized from LEMAY and BAIRD, as described above, in furtherance of this investigation. The search warrant, 3:16-cm-10, was received from The Honorable Mark E. Ford, US Magistrate Judge in Harrison, Arkansas in reference to two backpacks and four storage containers seized from Nathan LEMAY and Justin BAIRD in follow up to his inventory of the containers from 2/14/2016 at Rush Campground.

69.   On Thursday, March 3, 2016, at approximately 0837 hours, Officer Sullivan and I initiated the search, searching six total items or containers, which included the

25

following: a blue and black backpack, a green military style backpack, a clear

storage bin containing numerous paper wrapped minerals, a clear storage bin, a

green plastic storage bin, and a second green storage bin. We were assisted by

NPS Officers Dale Johannsen and Jason Flood, NPS Archeologist Caven Clark,

and NPS Geologist Charles Bitting.

70.    The search revealed that five of the six containers contained approximately 1,649

mineral/geological specimens as "Smithsonite," "Drusey Quartz," "Dolomite,"

"Sphalerite," "Gypsum," "Calcite," and "Quartz", examined in part by

Geologist Bitting and were consistent with type and composition of the known

material specific to the Historic Rush Mining District (HRMD) within Buffalo

National River. Other evidence in the form of fresh newsprint, newspapers and

circulars, snack wrappers, and a grocery receipt was discovered and examined

tying both LEMAY and BAIRD to the trafficking of mineral resources from

what appeared to be the Monte Cristo Mine and Buffalo National River.

71.    Based on my training and experience, I know that persons engaged in the

collection, and buying and selling of geological specimens, minerals, or artifacts

often buy, sell, and trade these artifacts, including ones that have been illegally

taken from museums, collections, repositories, or taken from public or Indian

lands. I also know that persons commonly use computers, phones, cameras, and

other electronic devices inside their residences, businesses, and other private

areas to document, buy, sell, trade, or exchange artifacts they possess.  I also

know based on my experience and training that persons engaged in these types of

activities collect and retain these resources long term for their personal use,

enjoyment, or for future exchanges, trades, or sales.

72.    Also based on my training and experience, I know that persons who illegally
       excavate often transport sifters or screens into sites and/or pack equipment into a
       site to cache the equipment at the location in order to routinely return to excavate
       artifacts or items at the site. Further, caching these specimens, tools and
       equipment reduce their labor at excavation, or the chances of being detected by
       law enforcement over the long term, if they are not detected hauling equipment
       or items to and from a site. Also, that persons engaging in this activity often take
       supplies in the form or food, snacks, drinks, and other sundry items into the sites
       to consume during their illegal activities.

## USES OF FACEBOOK

73.    Facebook owns and operates a free-access social networking website of the same
       name that can be accessed at http://www.facebook.com. Facebook allows its
       users to establish accounts with Facebook, and users can then use their accounts
       to share written news, photographs, videos, and other information with other
       Facebook users, and sometimes with the general public.

74.    Facebook asks users to provide basic contact and personal identifying
       information to Facebook, either during the registration process or thereafter. This
       information may include the user's full name, birth date, gender, contact e-mail
       addresses, Facebook passwords, Facebook security questions and answers (for
       password retrieval), physical address (including city, state, and zip code),
       telephone numbers, screen names, websites, and other personal identifiers.
       Facebook also assigns a user identification number to each account.

27

75.     Facebook users may join one or more groups or networks to connect and interact
        with other users who are members of the same group or network. Facebook
        assigns a group identification number to each group. A Facebook user can also
        connect directly with individual Facebook users by sending each user a "Friend
        Request." If the recipient of a "Friend Request" accepts the request, then the two
        users will become "Friends" for purposes of Facebook and can exchange
        communications or view information about each other. Each Facebook user's
        account includes a list of that user's "Friends" and a "News Feed," which
        highlights information about the user's "Friends," such as profile changes,
        upcoming events, and birthdays.

76.     Facebook users can select different levels of privacy for the communications and
        information associated with their Facebook accounts. By adjusting these privacy
        settings, a Facebook user can make information available only to himself or
        herself, to particular Facebook users, or to anyone with access to the Internet,
        including people who are not Facebook users. A Facebook user can also create
        "lists" of Facebook friends to facilitate the application of these privacy settings.
        Facebook accounts also include other account settings that users can adjust to
        control, for example, the types of notifications they receive from Facebook.

77.     Facebook users can create profiles that include photographs, lists of personal
        interests, and other information. Facebook users can also post "status" updates
        about their whereabouts and actions, as well as links to videos, photographs,
        articles, and other items available elsewhere on the Internet. Facebook users can
        also post information about upcoming "events," such as social occasions, by

28

listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

78.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

79.    Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat

history for the account. Facebook also has a Video Calling feature, and although
Facebook does not record the calls themselves, it does keep records of the date of
each call.

80.    If a Facebook user does not want to interact with another user on Facebook, the
       first user can "block" the second user from seeing his or her account.

81.    Facebook has a "like" feature that allows users to give positive feedback or
       connect to particular pages. Facebook users can "like" Facebook posts or
       updates, as well as webpages or content on third-party (i.e., non-Facebook)
       websites. Facebook users can also become "fans" of particular Facebook pages.

82.    Facebook has a search function that enables its users to search Facebook for
       keywords, usernames, or pages, among other things.

83.    Each Facebook account has an activity log, which is a list of the user's posts and
       other Facebook activities from the inception of the account to the present. The
       activity log includes stories and photos that the user has been tagged in, as well
       as connections made through the account, such as "liking" a Facebook page or
       adding someone as a friend. The activity log is visible to the user but cannot be
       viewed by people who visit the user's Facebook page.

84.    Facebook Notes is a blogging feature available to Facebook users, and it enables
       users to write and post notes or personal web logs ("biogs"), or to import their
       blogs from other services, such as Xanga, LiveJournal, and Blogger.

85.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends
       that appear as icons on the recipient's profile page. Gifts cost money to purchase,
       and a personalized message can be attached to each gift. Facebook users can also

30

send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

86.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

87.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

88.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

89.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical

31

problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

90.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows

investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

91.   Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

92.   I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized

persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

93. Based on the foregoing, I believe that Nathan LEMAY and Justin BAIRD travelled to Buffalo National River on or about February 14, 2016 specifically to search for and locate geological, mineral, or archeological resources, of archeological interest, within the Monte Cristo Mine which is greater than 100 years old. In addition, that on or about this date LEMAY and/or BAIRD did excavate, damage, alter, deface, or destroy an archeological resource, or attempted to do so, with the intent to remove geological specimens, minerals, or artifacts and transport it from the Park back to LEMAY's business, Alpena Crystals, in Alpena, Arkansas.

94. Further, that both persons have an active and current interest in the collection of geological and mineral resources and have said items in LEMAY's business taken from the Park and other locations, and assisted each other with this endeavor. That both LEMAY and BAIRD have used cell phones, computers, or the software and digital features they contain to communicate with others, including each other, to further these illegal activities.

95. I believe that they are currently using electronic and digital media, and computers to facilitate the exchange, transfer, trade, buying, and selling of resources taken from these locations from known and unknown persons. Further that evidence and records involving violations of **36 C.F.R., 2.1 (Preservation of natural, cultural, and archeological resources,) 16 U.S.C. § 470aa-47011**

34

Case 3:16-cm-00013-MEF   Document 1   Filed 04/08/16   Page 36 of 42 PageID #: 36

Sworn to and subscribed before me this ___8___ day of April, 2016.


Honorable Mark E. Ford
United States Magistrate Judge

## <u>ATTACHMENT A</u>

### DESCRIPTION OF PLACE TO BE SEARCHED

Information associated with the Facebook User ID,
**www.facebook.com/justin.baird.1694**, that is stored at premises owned, maintained,
controlled, or operated by **Facebook, Incorporated located at 1601 Willow Road,
Menlo Park, California 94025.**

**ATTACHMENT B**
**DESCRIPTION OF ITEMS TO BE SEIZED**

**I.** **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession,

custody, or control of Facebook, including any messages, records, files, logs, or

information that have been deleted but are still available to Facebook, or have been

preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to

disclose the following information to the government for each user ID listed in

Attachment A:

> (a) All contact and personal identifying information, including **for user ID:**
> **www.facebook.com/justin.baird.1694,** full name, user identification number,
> birth date, gender, contact e-mail addresses, Facebook passwords, Facebook
> security questions and answers, physical address (including city, state, and zip
> code), telephone numbers, screen names, websites, and other personal
> identifiers, between the creation of the account and the present;
>
> (b) All activity logs for the account and all other documents showing the user's
> posts and other Facebook activities;
>
> (c) All photos and videos uploaded by that user ID and all photos and videos
> uploaded by any user that have that user tagged in them;
>
> (d) All profile information; News Feed information; status updates; links to
> videos, photographs, articles, and other items; Notes; Wall postings; friend
> lists, including the friends' Facebook user identification numbers; groups and
> networks of which the user is a member, including the groups' Facebook
> group identification numbers; future and past event postings; rejected

"Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f) All "check ins" and other location information;

(g) All IP logs, including all records of the IP addresses that logged into the account;

(h) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i) All information about the Facebook pages that the account is or was a "fan" of;

(j) All past and present lists of friends created by the account;

(k) All records of Facebook searches performed by the account;

(l) All information about the user's access and use of Facebook Marketplace;

(m) The types of service utilized by the user;

(n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

39

(p) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.   Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of **16 U.S.C. § 470aa-470ll (the Archeological Resources Protection Act) and 18 U.S.C. § 641 (Theft of Government Property), 25 U.S.C. 3001 (Native American Graves Protection and Repatriation Act-NAGPRA), 18 § U.S.C. 1170 (Illegal trafficking in Native American Human Remains and Cultural Items), 18 U.S.C. § 1361 (Destruction of Government Property), 18 U.S.C. § 1163 (Theft from Indian Tribal Organizations,) 18 U.S.C. § 371 (Conspiracy,) 18 U.S.C. § 2314 (Interstate Transportation of Stolen Goods,) 18 U.S.C. § 2 (Principals,) and 36 C.F.R 2.1, Preservation of natural, cultural, and archeological resources, and 2.31 Trespassing, tampering, and vandalism** involving **Nathan Bradford LEMAY** since **August 1, 2009**, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) the illegal removal of geological specimens, minerals, or archeological resources, or other government property, or the damage, altering, defacing, or destruction of an archeological resource on public or Indian lands; the purchase, exchange, transport, receipt, or offer to sell, purchase, exchange, or transport of those items listed above excavated or removed from public or Indian lands, and in doing so damaged, altered, defaced or destroyed an archeological resource on public or Indian lands; and the communications

40

between Nathan LEMAY, Justin BAIRD, Alpena Crystals, and unknown

others, in planning or carrying out actions in furtherance of the scheme;

(b) Records relating to who created, used, or communicated with the user ID,

**www.facebook.com/justin.baird.1694,** including records about their

identities and whereabouts.

41